# Western New York & Pennsylvania Railway Company *v.* Buffalo, Rochester & Pittsburg Railway Company, Appellant.

*Railroads—Gauge—Narrow gauge railroads—Change of grade—Acts of April 11, 1853, April 4, 1868, March 17, 1869, June 19, 1871, sections 1 and 2, March 18, 1875.*

A railroad company organized under the Narrow Gauge Act of March 18, 1875, P. L. 28, which limits the gauge of railroads organized under the act to three feet, has no power to increase the width of its gauge, notwithstanding that no injury will thereby result to the public. The act of March 18, 1875, repeals so much of the Act of April 11, 1853, P. L. 366, as relates to railroads whose gauge is three feet or less.

There is nothing in the Act of March 17, 1869, P. L. 12, which will authorize a narrow gauge railroad company organized under the act of March 18, 1875, to increase its gauge to the standard gauge, as the authority in said act to any railroad to straighten or widen its lines, when it may be necessary, refers to the right of way, and not to the track.

The Act of June 19, 1871, P. L. 1361, sec. 2, relating to the regulation of grade crossings by courts of equity, and authorizing them to define by decree the mode of such crossing which will inflict the least injury on the rights of the company owning the road which is intended to be crossed, does not apply where the parties have established a crossing and are using it.

A railroad company whose tracks are crossed by the tracks of a narrow gauge railroad organized under the act of March 18, 1875, and which has the burden of maintaining the crossing, has a standing in equity under the Act of June 19, 1871, sec. 1, to raise the question of the narrow gauge company's right to widen its gauge, without regard to the official action of the commonwealth.

Argued May 2, 1899. Appeal, No. 362, Jan T., 1898, by defendant, from decree of C. P. McKean Co., June T., 1897,

No. 2, on bill in equity. Before STERRETT, C. J., GREEN, MITCHELL, DEAN and FELL, JJ. Reversed.

Bill in equity for an injunction.

The facts appear by the previous report in the case in 186 Pa. 215, and by the opinion of OLMSTED, P. J., which was as follows :

The Olean, Bradford & Warren Railway Company was incorporated September 29, 1877. It was soon after constructed and operated as a narrow gauge road, from Olean, N. Y., south to Bradford, Pa., and to other points further south. Some time prior to 1882 the Rochester & Pittsburg Railroad was incorporated. It was constructed and operated as a standard gauge road from Rochester, N. Y., to Bradford, Pa., and other points further south. It became necessary for the Rochester & Pittsburg road to cross the Olean, Bradford & Warren Railroad at a point near the city of Bradford, the present point of controversy. Legal proceedings were instituted for that purpose, and on June 17, 1882, the contract given in evidence was entered into between the contracting corporations. On the —— day of May, 1897, the plaintiff corporation, claiming the rights of the Olean, Bradford & Warren Railway, sought to widen the gauge of its-road at the point in controversy, as it had already done some distance to the north. It was resisted and prevented by the defendant corporation, and on the —— day of May, 1897, the bill was filed in this case praying for an injunction to "restrain the defendant from preventing the plaintiff from widening its gauges at the point in controversy." An injunction was issued, as prayed for, the case was appealed to the Supreme Court and affirmed, and on September 12, 1898, this case came on for the final hearing of the bill, Messrs. Mullin & Rumsey appearing for the plaintiff, and Messrs. Berry & Edgett appearing for the defendant.

At the hearing for the preliminary injunction, a large amount of evidence was taken and certified by the stenographer. An agreement has been filed signed by the solicitors of the parties, that this evidence should be considered by the court in the final disposition of the case, and to have the same force as though retaken, and that further evidence might also be taken, and at

the hearing on September 12, some further evidence was taken, and will be found among the files. Since the former hearing, a cross-bill has been filed by the defendants. On the former hearing, the law and the facts of this case were gone over at great length by the solicitors, and deeming it our duty to do so under the present rules of practice in equity, an opinion was filed by the court, giving the reasons which induced the action of the court. I assume that the record of the first trial will be before the Supreme Court on the hearing of the pending question, and that it is not necessary that I should repeat what I have already written, and for that reason, I confine myself in this opinion merely to the matters added since the former hearing.

We have been requested in writing by the counsel for the defendant to find the following facts:

1. The Olean, Bradford & Warren Railway Company was incorporated under the act of assembly of the commonwealth of Pennsylvania, approved March 18, 1875, as a narrow gauge railway, and its charter, as well as the act of assembly, expressly limits the width of track to three feet. *Answer:* I find, as requested in this first request of findings, that the Olean, Bradford & Warren Railway was incorporated as a narrow gauge railroad, and the gauge is so fixed in its charter. It was incorporated on September 28, 1877. It was incorporated agreeably to the provisions of the act of the general assembly of Pennsylvania, entitled, "An act to authorize the formation and regulation of railroad companies," and the several supplements thereto.

2. There is no evidence of any amendment to, or change of, this charter, and the chartered rights of the Olean, Bradford & Warren Railway Company are now the same as when the charter was granted. *Answer:* To the second request, we say that there is no evidence of any amendment to, or change of, this charter by any special legislation, and its chartered rights are such as are given to such corporations by the general laws of the commonwealth.

3. There has been no consolidation or merger of the Olean, Bradford & Warren Railway Company into or with any other railroad or railway company. *Answer:* There was no technical merger of the Olean, Bradford & Warren Railway with the

Western New York & Pennsylvania Railway by the provisions of the contract of December 8, 1881. Technically, it was a lease for 999 years. It was not a statutory merger.

4. The only interest or title that the plaintiff company acquired in or to the property of the Olean, Bradford & Warren Railway Company is that of lessee by virtue of a certain lease made by the Olean, Bradford & Warren Railway Company to the Buffalo, New York & Pennsylvania Railway Company, dated December 8, 1881. *Answer :* We have just said in answer to the third request that the contract of December 8, 1881, was technically a lease.

5. The plaintiff has introduced no evidence showing the character of its ownership or right of possession of any land or property at the point of crossing, except the evidence of B. J. Wilmoth to the effect that it had at the point of crossing the possession of the right of way in 1882. *Answer :* This point we find as stated, with the qualification that Wilmoth says it has occupied forty feet in width, and deeds offered by the defendant showing the defendant's right, show a reservation to the Olean, Bradford & Warren Railway.

6. The defendant, the Buffalo, Rochester & Pittsburg Railway Company, has succeeded to the title to a right of way over the land at the point of controversy by virtue of sundry conveyances from James W. Hilton, who was the owner of the fee at the time the Olean, Bradford & Warren acquired, if it acquired at all, its right of way. *Answer :* I find, as requested in this point, that the defendant company has succeeded to the title to a right of way, but by grants subsequent to the occupying by the Olean, Bradford & Warren Railway, and the right of way to the Olean, Bradford & Warren is reserved in the grants.

7. Prior to the beginning of said action, the railroad, roadbed and property of the Olean, Bradford & Warren Railway Company, from a point near the old passenger station in the city of Bradford, formerly known as the Kendall passenger station, and being about one and a half miles north and east of Main street in said city, to the village of Olean, in the state of New York, had ceased to be operated as a steam railway, and was then in possession of, and being prepared for operation by, an electric railway company, and that for a long time prior to

the instituting of said action the operation of the said railroad had been abandoned from the village of Red Rock, in the county of McKean, to the village of Olean, in the state of New York. *Answer :* I cannot say that the plaintiff company has abandoned their road from Olean to Foster Brook, but find that over a considerable portion of way between the two points mentioned an electric road is being operated, but there is no evidence in the case showing under what arrangement, if any, this is being done.

8. A portion of the line of the Olean, Bradford & Warren Railway Company, extending from Bradford south to a point near Marshburg, in McKean county, and being a distance of about twelve miles, had ceased to be used as a railroad, had not been operated as a railroad, has been abandoned for a railroad, and, as testified to by R. Bell, superintendent of the Western New York & Pennsylvania Railway Company, that there is no prospect of a resumption of operation. *Answer :* In answer to this request, I find that the line between the points mentioned is not now operated by the running of trains, and that Mr. Bell has testified that there is no prospect of a resumption of operation.

9. That the only portion of the Olean, Bradford & Warren Railway between the village of Olean, in the state of New York, and the village of Marshburg, in the state of Pennsylvania, being a distance of more than thirty miles, which is now proposed to be operated by the plaintiff company, is a short piece of road, not exceeding a mile and a half or two miles in length in the city of Bradford. *Answer :* The portion of the Olean, Bradford & Warren Railway between the village of Olean, in the state of New York, and the village of Marshburg, in the state of Pennsylvania, a distance of near thirty miles, is not now operated as a steam road, except the distance from Foster Brook to Bradford, some two miles. What the future purpose of the defendant company may be, I cannot definitely determine.

10. All of the manufacturing interests and plants which it is proposed to reach by this short piece of road are now reached, and can be reached by the plaintiff company over the tracks of the Buffalo, Rochester & Pittsburg Railway Company, and by the means of such tracks, switches and

sidings. *Answer:* I find that by the contract of June 1, 1896, the plaintiff company has the right to use the tracks and switches of the defendant company at Bradford for five years from that date, and that existing manufacturing plants can be reached by such tracks, switches and sidings.

11. The evidence discloses that the sole purpose of the plaintiff company in seeking to obtain this crossing is to use the same for switching purposes. *Answer:* I find that the present purpose of plaintiff 'company in seeking to widen this crossing is for switching purposes, and for easier access to the existing manufacturing plants.

12. The evidence shows that the only purpose to be fulfilled by the widening of this crossing is to serve the private convenience of the plaintiff company; there is no evidence of any public demand or necessity for the same. *Answer:* I do not find as requested by this point. The widening of the crossing would be a convenience to the plaintiff company in handling freight, and therefore is of some interest to the public.

13. The possession of the old roadway of the Olean, Bradford & Warren Railway Company at the point of crossing and ownership of the same, has been in the Olean, Bradford & Warren Railway Company, subject to its lease to the Buffalo, New York & Pennsylvania Railroad Company. *Answer:* I find, of course, that the possession of the old roadway of the Olean, Bradford & Warren Railway Company, at the point of crossing, and ownership of the same, has been in the Olean, Bradford & Warren Railway Company, except as affected by its lease to the Western New York & Pennsylvania Railway Company.

14. The Olean, Bradford & Warren Railway Company is not seeking to make this crossing. *Answer:* I cannot find as requested in this point.

15. The Olean, Bradford & Warren Railway Company has never authorized this crossing to be made, or widened, or changed by the plaintiff. *Answer:* I cannot find as requested in this point.

Requests by defendant for conclusions of law:

1. The Buffalo, Rochester & Pittsburg Railway Company having succeeded to the title to a right of way over the lands at the point involved in this controversy, and the Olean, Brad-

ford & Warren Railway having only an easement for the right of way over said lands, and said Olean, Bradford & Warren Railway Company, or its lessee, having abandoned all of its line between the village of Olean, in the state of New York, and a point near Marshburg, in the state of Pennsylvania, except a short piece of about one and a half or two miles in the city of Bradford, such abandonment works a forfeiture, which forfeiture accrues to the defendant, can be insisted upon by such defendant and will prevent the plaintiff in this cause having the relief asked for. *Answer:* We answer in the negative.

2. The plaintiff claiming under the Olean, Bradford & Warren Railway Company, under all the evidence in this case, having abandoned the operation of its road, held by it as lessee as above set out, has no right to make this crossing, the right which the Olean, Bradford & Warren Railway Company had acquired by its charter having lapsed by reason of such abandonment. *Answer:* We answer this in the negative.

3. The Olean, Bradford & Warren Railway Company being by the terms of its charter expressly restricted to the constructing and operating a road with a gauge not exceeding three feet in width, and not having amended its charter or procured any additional charter, has no power to construct or operate a road with a gauge exceeding three feet at the point of crossing, or any other point on its line, and its lessee, the plaintiff in this action, having no greater rights than the Olean, Bradford & Warren Railway Company, is not entitled to the relief asked for. *Answer:* We answer this request in the negative.

4. There being no evidence of any corporate act on the part of the Olean, Bradford & Warren Railway Company authorizing the plaintiff to widen this crossing, such act is in excess of the power conferred by the lease from the Olean, Bradford & Warren Railway Company to the Buffalo, New York & Pennsylvania Railway Company, and the plaintiff company has no authority in law to change the crossing in any way, widen the same or to operate any changed or widened crossing. *Answer:* It being expressly stated in the eighth paragraph of the plaintiff's bill that the board of directors of the Olean, Bradford & Warren Railroad and the Western New York & Pennsylvania Railway had passed resolutions to widen their gauge, and this not being denied in the answer to said paragraph, it is in legal effect

admitted, and is so to be taken.    See Penna. Schuylkill Valley Railroad Co. v. Philadelphia & Reading R. R. Co., 160 Pa. 277. No such question is raised by the pleadings, and if it were, the evidence in the case shows the passage of the resolution by both boards of directors to widen this gauge.

5. The plaintiff, having acquired by its lease only the power to operate and construct a railway, has no power to make any change in the width of the gauge of said road, or to change its crossing.    *Answer:* We cannot affirm this point under the evidence in the case.

6. The resolution of the board of directors of the Olean, Bradford & Warren Railway Company, in evidence in this case, does not confer any authority upon the plaintiff to widen this gauge or to change the gauge of said road.    *Answer:* We cannot affirm this point under the evidence in the case.

7. The defendant having succeeded to the ownership of a right of way is in a position to insist upon all rights of the premises which J. W. Hilton, under whom the plaintiff claims, could have had in the premises, and the Olean, Bradford & Warren Railway Company, having abandoned the operation of its road for the greater part of its length, cannot retain, either by itself, or through its lessee, possession of a small portion of its right of way for the purpose of operating thereon a switch or a road to be used solely for switching purposes; and therefore the plaintiff is not entitled to the relief prayed for in its bill.    *Answer:* We cannot affirm this point.

8. The charter of the Olean, Bradford & Warren Railway and the act of assembly under which the same is granted in express terms limiting the width of the road to be built thereunder to three feet, no road of a greater width could be built, operated or maintained under said charter, or under the lease from the said Olean, Bradford & Warren Railway Company to the Buffalo, New York & Pennsylvania Railway Company, and therefore the plaintiff is not entitled to relief asked for in its bill.    *Answer:* We cannot affirm this point.

9. The plaintiff company having in its argument before the Supreme Court abandoned any right to this crossing under the contract of June 17, 1882, its sole right to relief prayed for must be predicated upon the act of 1871, and upon such terms as the court would impose and upon a bill filed specifically

under the provisions of said act, and cannot be granted in the said proceedings. *Answer:* We decline to find as requested in this point.

10. Under all the evidence in the case, the bill must be dismissed. *Answer:* We answer this point in the negative.

It appeared to me on the former hearing in this case that the right of the Olean, Bradford & Warren Railway Company to widen its gauge from three feet to four feet eight and one half inches was too clear for argument. The Act of April 11, 1853, P. L. 366, expressly provides " that every railroad company heretofore chartered, or which may hereafter be chartered, is hereby authorized to construct or change their gauge or gauges of road to such width as the directors of such railroad company may deem expedient, and all laws inconsistent with this provision be and they are hereby repealed." Again, by the Act of March 17, 1869, P. L. 12, it is enacted " that it shall and may be lawful for any railroad, canal, and slack-water navigation company, now or hereafter incorporated under any laws of this commonwealth, to straighten, widen, deepen, enlarge and otherwise improve, the whole or portions, of their lines or railroads, canals, and slack-water navigation, and the bridges, crossings, sidings . . . . wherever, in the opinion of the board of directors, the same may be necessary for the better securing the safety of persons and property, and increasing the facilities and capacity for the transportation of traffic thereon." If these statutes do not grant the power to the Olean, Bradford & Warren Railway Company to widen its gauge and crossing, then the English language is an unfortunate one in which to express human thought.

My attention has not been called to any decision construing these statutes except Millvale Borough v. Evergreen Railway Company, 131 Pa. 1, in which the widening of a gauge was in effect sustained. It is contended with much skill, by the counsel for the defendant, that there has been a legal abandonment of the line of the road, and that the power of the company to widen the gauge of the road from Foster Brook to Bradford city is lost by reason of such abandonment. This, of course, is predicated upon the idea of forfeiture of the charter, and we are asked to so hold. We cannot so decide. The commonwealth is the grantor of the franchise. Whether it has been

forfeited by nonexercise or otherwise is a question between the commonwealth and her grantee. If the commonwealth does not choose to exercise her right to assert the forfeiture, the decisions, as we understand them, do not confer that right upon a private litigant. This doctrine is held by an unvarying line of cases by our Supreme Court from Irvine v. Lumberman's Bank, 2 W. & S. 204, down to the case of The Petition of the Philadelphia & Merion Railway Company, to be found in 187 Pa. 123. The case of the Western Pennsylvania Railroad Company's Appeal, 104 Pa. 399, is a strong case upon this question, as it construes the Act of June 19, 1871, P. L. 1361. It was contended on the trial of the above case that under the 1st section of the above cited act the court had the right to inquire into the facts as to the forfeiture as though on a bill filed by the attorney general in the name of the commonwealth against the defendant. To this contention, the court held that " the act of 1871 contemplates nothing more than that it shall be made to appear from the charter that the corporation has the power to do the particular act in controversy and which involves some right of the contestant, but when we get beyond this, we assume something with which we have no business in a collateral proceeding ; we assume to assert the rights of a third party, the commonwealth, who may or may not, at her own option, insist upon the observance of those rights."

Since the former hearing a cross-bill has been filed in the case, averring that a grade crossing at the point of controversy would be dangerous to the public, and some evidence has been taken by both parties upon that question, and before proceeding farther a reference to the facts of the case may aid us in its decision.

The Olean, Bradford & Warren Railroad was incorporated September 29, 1877. The gauge mentioned in the charter was three feet. It was immediately after constructed and operated as a three-foot road. About 1882 the Rochester & Pittsburg Railroad was incorporated. This road was soon afterwards constructed and operated from Rochester, in the state of New York, to some point south, or southwest of Bradford city. By various charters and transfers, not necessary to detail here, it became the Buffalo, Rochester & Pittsburg Railroad, and is

operated by that name, and as such is made defendant here. It became necessary, in the opinion of the board of directors of the Rochester & Pittsburg, that it should cross the Olean, Bradford & Warren Railroad at a point near Bradford, the present point of controversy. Legal proceedings are constituted to accomplish that purpose, and on June 17, 1882, a contract was entered into between the Olean, Bradford & Warren Railroad and the Rochester & Pittsburg upon the subject of this crossing, and by this contract the Rochester & Pittsburg was permitted to cross the Olean, Bradford & Warren Railroad at Bradford, the point now in controversy. (This contract contains other matter not necessary to refer to here.) This crossing was made and is operated up to the present time. For present purposes we may consider that the rights of the Olean, Bradford and Warren Railroad passed into the control of the Western New York & Pennsylvania Railway, the party plaintiff in this case. The Western New York & Pennsylvania Railway is a standard gauge, and at the present time gets its trains into Bradford over the tracks of the Buffalo, Rochester & Pittsburg Railway for some nine and one half miles, under contract of June 1, 1896, given in evidence in this case. The plaintiff then seeks to widen the gauge of what was formerly the Olean, Bradford & Warren from Foster Brook to the station in the city of Bradford. This renders it necessary that the track should be increased in width at the point where the defendant crosses.

Now how can it be successfully contended that the plaintiff stands in the position of a railroad being constructed reaching another road already in operation, that it must necessarily cross. It (the plaintiff) is prior in right. It existed and was successfully operated without a crossing. The defendant company, partly by law and partly by the grace of the plaintiff, obtains a grade crossing. The defendant has the crossing, not the plaintiff. If a grade crossing at the point in controversy is dangerous, the defendant should be called upon to remedy the evil. It would be a strange condition if one railroad could obtain the right to cross an existing railroad, either for a consideration, or otherwise, and then turn around and say this grade crossing which I have obtained from you is dangerous, and you must be at the great expense of elevating your tracks. The plaintiff is not seeking to make a crossing, but to widen its tracks

at a point where the defendant has a crossing. It is difficult to understand how this track, if made a few inches wider, at the point of defendant's crossing, can injure the defendant or endanger the public.

I can hardly think that the Act of June 19, 1871, P. L. 1360, has any application to the case before us. " Under that act, the court shall define by decree the mode of such crossing, which will inflict the least practical injury upon the rights of the company owning the road, which is intended to be crossed." " The act applies where a new line proposes to cross an existing road, that is, there must be an 'intended' crossing of the existing road. There is no provision for an interference where the parties have established the crossing, and used it : " Junction Railroad Company v. Citizens Passenger Railway Company, 9 Montgomery County Law Reporter, 103. The construction of the crossing is what the statute says shall be regulated by the courts, and this with a view to avoid danger and protect the older's franchise from injury by the younger one : Traction Company v. Canal Company, 180 Pa. 642.

I find in all cases reported in Pennsylvania since the act of 1871, where a crossing is sought, and the Supreme Court have given effect to said act, that the application to cross has come from the younger corporation, and where an overhead crossing, or a crossing below grade, is decreed, that it has been done at the expense of the younger corporation. But suppose it to be the duty of the court, under the act of 1871, to regulate this crossing, should they require it to be an overhead crossing ?

There are many things to be considered by the court in determining whether a crossing shall be at grade, or otherwise, and one of these is the cost. While this is by no means always a controlling consideration, in this case it has much significance. The defendant's witness, Hoyt, testifies that the expense of this crossing would be about $85,000, exclusive of additional rights of way that would have to be obtained. This amount is so great as to entirely preclude the possibility of an overhead crossing on any road except one of the greatest importance. In Penna. Schuylkill Valley Railroad v. The Philadelphia & Reading Railroad, 160 Pa. 277, the Court held that a court of equity will not, under the Act of June 19, 1871, P. L. 1361, decree the construction of an overhead crossing where the cost

of such crossing would be so great as to prevent the construction of the railroad. The cost of the crossing in the above case was found by the master to be from $40,000 to $60,000, including damages and additional right of way. The strongest case against grade crossings to be found in our reports is Perry Co. R. R. Co. v. Railroad Co., 150 Pa. 194, but in that case the plaintiff road undertook to trample the defendant road into the dust. The plaintiff undertook to cross the defendant's road twice in four miles, making a loop, while the evidence demonstrated that by the expenditure of $20,000, the plaintiff company could have constructed its road over a practicable route without any crossing whatever. In Railway Co. v. Railway Co., 149 Pa. 1, the Court permitted a grade crossing, although the finding was that an overhead crossing would cost but $9,000. In Traction Company v. Canal Company, 180 Pa. 640, the Supreme Court decreed an overhead crossing, the evidence showing the construction would cost but from $6,000 to $8,000. In Altoona, etc., R. R. Co. v. Railroad Co., 160 Pa. 624, the Court said that four grade crossings within eight miles will not be permitted, when it is reasonably practicable to construct overhead crossings at a cost of from $12,000 to $15,000 each. The facts as presented in this case are certainly strongly against the practicability of a crossing, except at grade.

At the former hearing of this case, the contract of December 8, 1881, between the Olean, Bradford & Warren Railway and the Buffalo, New York & Pennsylvania Railway, was treated as a merger contract. This was incorrect, as the contract itself purports to be a demise, or lease for 999 years, the corporate existence of the Olean, Bradford & Warren Railway still being retained by the terms of the contract, and now the idea suggests itself whether this action is technically correct in the name of the Western New York & Pennsylvania Railway, without joining in any way the name of the Olean, Bradford & Warren Railway; but as this objection, if it exists at all, is a purely technical one, and in no way affects the merits of the controversy, and can be corrected by amendments without injury to the defendant, we have concluded to pass it by, at least for the present.

I am of the opinion that the plaintiff is entitled to the relief prayed for in this bill.

*Error assigned* was the decree of the court.

*George A. Berry*, of *Berry & Edgett*, and *John G. Johnson*, with them *C. M. M' Cauley*, for appellant.—The Olean, Bradford & Warren Railway Company, by the terms of its charter, expressly stipulated with the commonwealth that, in consideration of the limited amount of capital subscribed and required to be subscribed and paid in, this company bound itself to construct, operate and maintain only such a road as by the terms of the act of 1875 it could construct, operate and maintain: Millvale Borough v. Evergreen Ry. Co., 131 Pa. 21.

A corporation, unless especially restricted by its charter or some statute, has general power to dispose of its property, the whole or part, but it has no right to sell or assign its franchise either in whole or in part unless specially authorized by law: Pittsburg, etc., R. R. Co. v. Bedford, etc., R. R. Co., 81* Pa. 104 ; Stewart's App., 56 Pa. 422.

There is no legislative authority in Pennsylvania for the leasing of one railroad company to another of its unexercised corporate franchise : Com. v. Pittsburg, etc., R. R. Co., 24 Pa. 159; City of Philadelphia v. Phila, etc., R. R. Co., 25 W. N. C. 320 ; Pierce v. McCracken, 5 Cent. Rep. 283.

A party applying for an injunction will be strictly held to the precise grounds upon which by the terms of his bill he claims this extraordinary remedy: Hilliard on Injunction, p. 51 ; Paton v. Clark, 156 Pa. 49 ; Shroder's App., 1 W. N. C. 528 ; City of Philadelphia's App., 78 Pa. 33 ; King v. McCully, 38 Pa. 76.

*John J. Henderson*, with him *Eugene Mullin*, for appellee.— In the absence of any repealing clause it is essentially necessary to the implication of a repeal that the object of the two statutes be the same.    If they are not, both statutes will stand, though they refer to the same subject : Safe Deposit & Trust Co. v. Fricke, 152 Pa. 238; Com. v. Decamp, 177 Pa. 116; United States v. Claflin, 97 U. S. 546 ; Hendrix's Account, 146 Pa. 285.

By this lease the appellee, which succeeded to the title and rights of the Buffalo, New York & Pennsylvania Railroad Company, acquired the rights and franchises theretofore belonging to the lessor : Gratz v. Penna. R. Co., 41 Pa. 447 ; Phila., etc., R. R. Co. v. Catawissa R. R. Co., 53 Pa. 20 ; Penna. R. R. Co. v. Sly, 65 Pa. 205.

If it were true, however, that the plaintiff was not using the road leased from the Olean, Bradford & Warren Company, the appellant cannot raise that question in this proceeding. The manner in which a corporation exercises its franchise is a subject which the appellant cannot call in question: Murphy v. Farmers' Bank of Schuylkill County, 20 Pa. 418; Slee v. Bloom, 7 Johnson's Ch. Rep. 137 ; Rafferty v. Cent. Traction Co., 147 Pa. 579 ; West. Pa. R. R. Co.'s App., 104 Pa. 399; Com. v. Phila., etc., R. R. Co., 20 Pa. 518.

The distinction between the widening of plaintiff's track and making a crossing is too clear to admit of any confusion of thought. The act of June 19, 1871, was passed to regulate the manner in which roads thereafter to be constructed might cross roads existing at the time of such construction. It applies where it is proposed to cross an existing road. In the case under consideration the crossing has been in existence ever since the construction of appellant's road, and no judicial or legislative interference is necessary or sought, with reference thereto : Traction Co. v. Canal Co., 180 Pa. 642.

OPINION BY MR. JUSTICE MITCHELL, October 6, 1899:

This case was here before on an appeal from a preliminary injunction, 186 Pa. 212. There being facts involved which were not then finally ascertained we followed the usual practice of not interfering with the interlocutory action of the court below unless clearly erroneous and immediately injurious to the appellant. We therefore affirmed the decree, but did not pass upon the final merits of any of the questions involved. These therefore are now open for consideration.

In the first opinion of the court below (see 186 Pa. 215), the Olean, Bradford and Warren Company was treated as having merged in the present plaintiff, but it is now conceded that the agreement between them was not one of merger but of lease. The plaintiff, the Western New York and Pennsylvania Railway Company, is therefore a lessee of the Olean, Bradford and Warren, and has with regard to the present controversy only the powers of its lessor.

Plaintiff's bill is based principally upon the contract made June 17, 1882, between the Olean, Bradford and Warren Company and the defendant's predecessor, the Rochester and Pitts-

burg Company, in accordance with which, as it seems, though it is not made entirely clear, the original crossing was constructed. The learned judge below was of opinion that nothing in this contract took away the right of the Olean, Bradford and Warren to change its gauge if such right existed. This we may concede, but it leaves as the ruling question in the case whether that road, under its charter and the general laws of the state, had the right now claimed to change its tracks from narrow to standard gauge.

The early policy of the state seems to have treated the gauge as a matter to be left to the discretion of each road as its requirements might dictate, and accordingly roads were built with considerable diversity in this respect. There was a time when what was commonly known as the "broad gauge" came into use, and considerable litigation arose in the northwestern corner of the state in which this subject played a part, as bearing on "through lines" and the transit of cars between different but connecting roads. But the gradual adoption of what is known as the "standard" gauge appears to have been the result of experience and general convenience, and not of statutory regulations.

The general railroad act of 1849 makes no direct reference to gauge, though its determination by the railroad is implied in sec. 18, P. L. 86, which provides that on the completion of any such road it shall be esteemed a public highway for transportation of freight and passengers, subject to such rules and regulations, inter alia, "as to the size and construction of wheels, cars and carriages," etc., as the directors may prescribe, "provided that the company shall have exclusive control of the motive power," and may collect toll "for the use of such road and of said motive power, and the conveyance of passengers, the transportation of merchandise and commodities, and the cars or other vehicles containing the same, or otherwise passing over or on the said railroad." In the light of experience this section is curious also, as showing the survival as late as 1849 of the primitive conception of a railroad as simply an improved highway on which, as on a turnpike or a public post-road, travelers would commonly use their own carriages of conveyance or draught, subject to the payment of toll, and getting their relays of motive power from the company.

I have also looked through such of the early acts of incorpora-

tion of railroads as are readily accessible in the pamphlet laws, as far back as the charter of the Pennsylvania Railroad from Philadelphia to Columbia, in the county of Lancaster, in 1823, without finding any regulation or direct reference to the subject of gauge. It seems probable, however, that there must have been some such provisions in some of the charters, or at least that doubt and question must have arisen, for the Act of April 11, 1853, P. L. 366, is entitled " An act repealing the acts regulating the gauge of the track of railroads," and expressly authorizes railroad companies theretofore or thereafter chartered to construct or change their gauge or gauges of road to such width as the directors may deem expedient.

Several railroads had been chartered to connect with roads in Ohio, and among others the Ohio and Pennsylvania Railroad by the Act of April 11, 1848, P. L. 1849, App. 754, which recited a similar incorporation by the state of Ohio: Act of April 11, 1848, P. L. 1849, App. 755. Neither act contains any express provision as to gauge, but reference is made to the general railroad law of Ohio, of February 11, 1848, printed in appendix to Pa. P. L. 1849, p. 756, and also in P. L. 1853, p. 66, section 21 of which prescribes a gauge of four feet ten inches between the rails on all roads under the act. Doubt seems to have arisen on this point as to the Ohio and Pennsylvania road, and on February 19, 1849, a supplement was passed to the Pennsylvania act, " That for the purpose of preventing as far as possible the evils of transshipments from one set of cars to another, and to prevent their occurring at the state line, the Ohio and Pennsylvania Railroad Company are authorized to make the width of the track of that part of their road in Pennsylvania the same as it is required to be in Ohio, . . . . to wit, four feet ten inches, notwithstanding anything to the contrary in the act of which this is a supplement : " P. L. 1849, p. 78.

Whether the act of 1853 was passed with reference to other roads in a similar position, or with reference to other statutes dealing with the subject of gauge which the investigation in the present case has not discovered, I am unable to say. But it is clear that the act of 1853 gave full power, not only to construct, but to change, the gauge at the discretion of the directors. It remains to be seen whether this power has been modified in any way by subsequent legislation.

Railroad companies, as to their formation and regulation, are governed by the Act of April 4, 1868, P. L. 62, which prescribes, inter alia, certain conditions precedent as to capital stock. It makes no distinction between roads with reference to their gauge. By a supplement, however, passed March 18, 1875, P. L. 28, very material modifications are made in favor of roads with a gauge not exceeding three feet. The required capital stock is reduced from $10,000 to $6,000 per mile, and the shares of stock subscribed for, and the amount of money necessary to be paid in before the filing and recording of the articles of association, are materially lessened. This act therefore makes a distinct classification of railroads with reference to gauge, and to that extent limits the power of the directors of a company organized under it to a gauge not exceeding three feet. To that extent it repeals the act of 1853. The latter repealed then existing restrictions on the discretion of the directors if any there were, but it cannot operate to do away with the force of restrictions imposed by the later act on railroads of a special class. The provisions are too clearly repugnant in material points to stand together.

The Olean, Bradford and Warren road was organized under the act of 1875, and therefore is expressly limited by that act and by its charter to a gauge not exceeding three feet. To become entitled to such charter, the law required it to perform certain conditions precedent different from those required for a charter under the act of 1868, and much less onerous. There is no evidence before the court that the road has complied, or even that it was or is able to comply, with the prerequisites for a charter under the act of 1868, and if such evidence were presented the court could not consider it, for such compliance is not a matter for judicial but for executive determination, committed by the statute to the secretary of the commonwealth.

It is argued by appellee that even if a railroad should be incorporated under the act of 1875, and then it should widen its gauge, no injury could be done to the public, as the cost of the improvement must come from the stockholders or the corporate treasury, and the statutory limitation of the right of all railroads to borrow money is a safeguard which would not be impaired. But this is not a consideration which courts may regard. The legislature has made a class of railroads with

limited powers in this respect, and to it the road in question belongs. Whether the distinction between the classes could be disregarded without injury to the public or not, the law has fixed it and the courts must enforce it. The directors of a railroad chartered as a member of the limited class cannot by their own vote disregard the limitations and transfer the road to the unrestricted class. The vote of the directors of the Olean, Bradford & Warren, and the vote of its lessee, the plaintiff company, were alike unavailing for that purpose.

It is also argued by appellee that power to change the gauge is conferred by the Act of March 17, 1869, P. L. 12, which declares that " it shall and may be lawful for any railroad, canal and slack water navigation company, now or hereafter incorporated by or under any law of this commonwealth, to straighten, widen, deepen, enlarge or otherwise improve the whole or portions of their lines of railroads, canals and slack water navigation . . . . whenever in the opinion of the board of directors of such company the same may be necessary for the better securing the safety of persons and property and increasing facilities and capacity for the transportation of traffic thereon, and for such purposes to purchase, hold and use, or enter upon, take and appropriate land and material," etc., with provision for ascertainment of damages in case of inability to agree with the owners of property taken. It is, however, exceedingly doubtful if this act has any applicability. The subject of gauge is nowhere expressly mentioned. The words " widen, enlarge and improve " are sufficient in their general sense to cover it, but they are used with reference to the " lines " of railroads, canals and slack water navigation, which as to railroads clearly means what is commonly called the right of way. This, under the act of 1849, is not to exceed sixty feet in width, except in certain specified cases of necessity, and the power to widen given by the act of 1869 has reference to this feature of construction. So as to the power to straighten. Under the general rules of law the corporate power to locate its route and acquire the land by eminent domain is exhausted by its first complete exercise. But experience in railroading has shown the expensiveness in wear and tear and other disadvantages of curves and detours made to avoid natural obstacles, and the greater economy as well as other advantages of a straight track. It was in aid of

this kind of improvement that the act of 1869 gave the powers to straighten, widen, etc., the "lines" of the railroad. The context with which the words are used, and the accompaniment throughout the act of provisions for the settlement of damages under eminent domain, tend to show that the subject of change of gauge was not within the contemplation of the act. Such change involves no exercise of eminent domain, and there was already on the statute books the act of 1853, which completely covered the subject and made the act of 1869 superfluous as to it.

But even if we could hold the act of 1869 applicable to change of gauge, it would still be subject to the repeal, so far as relates to narrow gauge roads, by the act of 1875 already discussed.

The learned judge below was entirely correct in holding that the Act of June 19, 1871, sec. 2, P. L. 1361, in relation to the regulation of grade crossings by courts of equity, did not control this case. The Olean, Bradford & Warren was the first, and the appellant being the second comer was bound to exercise its rights in subordination to the prior rights of the Olean, Bradford & Warren. Under the contract of 1882, however, the appellant acquired a status as to the existing crossing of which it has the burden of maintenance. This gives it a standing under the 1st section of the same act to raise the question of the complainant's right or franchise to do the act in dispute, so far as relates to appellant's own interests, without regard to the official action of the commonwealth.

There are some other serious questions in the case, such as those regarding the alleged abandonment by the Olean, Bradford & Warren of much the larger part of its line, and the good faith of the change of gauge, averred not to be for itself or its own legitimate use, but for ulterior purposes. As, however, the view we take of the want of power to make the change at all is decisive of the whole case, it is unnecessary to discuss these other points.

Decree reversed, injunction dissolved, and bill directed to be dismissed at costs of complainant.